**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 12-cv-01873-RBJ-MEH

MALIBU MEDIA, LLC,

      Plaintiff,

v.

LINDSEY V. MANESS,

      Defendant.

_____

**MOTION FOR ATTORNEY'S FEES**
_____

      Defendant, Lindsey Maness, by and through undersigned counsel and pursuant to Fed.R.Civ.P. 54(d) and 11, Section §505 of the Copyright Act, 35 U.S.C. §1927, and the Court's inherent power hereby moves for an award of attorney's fees, against Plaintiff ("Malibu Media"). Mr. Maness also seeks the imposition of a lodestar multiplier.  In support thereof, Defendant states as follows:

**BRIEF IN SUPPORT OF DEFENDANT'S MOTION**

      This case is of critical importance to thousands of people throughout the country. Plaintiff, Malibu Media, in just the last six months has filed approximately 358 identical law suits implicating approximately 5,000 individuals (and counting) for allegedly sharing its adult content through BitTorrent file sharing networks.[1] Using unproven and questionable methods to identify individuals it believes are violating its rights Malibu Media has carelessly cast a broad net of litigation that ensnares both the guilty and the innocent. Mr. Maness is one of those

_____

[1] See Exhibit U for a summary of Malibu Media's litigation activities from 2/8/18 -11/7/12.

1

innocents that has been ensnared and has paid a large price both personal and financial to proclaim his innocence.

Malibu Media unfairly exploits the economic position of an untold number of innocent individuals, such as Mr. Maness who cannot afford to defend themselves against its legal machinery. Absent the promise of an award of attorney's fees when the copyright holder unreasonably persists even in the face of continual offers of proof, innocent defendants have little incentive to risk the turbulent and uncharted waters of a protracted legal battle. Congress gave the court the power to alleviate this imbalance of power. Section §505 of the Copyright Act, among other statutory and inherent powers, enables a court to award attorney's fees based on equitable discretion. This court's decision will help determine whether defendants like Mr. Maness can afford to take a stand in the face of personal and financial ruin.

It is no wonder that when faced with the threat of costly litigation to defend their names and the possibility that hundreds of thousands -- if not millions -- of dollars in damages might be wrongly assessed against them by a jury, it is understandable that many innocent people like Mr. Maness might be pressured into unfair settlement offers because they cannot afford the legal costs to fight back. *See* SB*O Pictures, Inc. v. Does 1-3036*, 2011 U.S. Dist. LEXIS 137361, at *11 (N.D. Cal. Nov. 30, 2011) (defendants "whether guilty of copyright infringement or not would [] have to decide whether to pay money to retain legal assistance to fight the claim that he or she illegally downloaded sexually explicit materials, or pay the money demanded. This creates *great potential for a coercive and unjust* 'settlement'")(emphasis added). Wielding the threat of copyright lawsuits as a club, Malibu Media has already bullied hundreds if not thousands of average Americans into settling regardless of guilt. Though Malibu Media unquestionably has

the right to enforce its copyrights through lawsuits and settlements, it does not have the right to do so against people, such as Mr. Maness whom it knows or reasonably should know is innocent.

Legal and equitable grounds exist that warrant these fees be awarded in order to compensate Mr. Maness for the costs of defending against Malibu Media's unwarranted prosecution, to prevent Malibu Media -- and other similar mass-copyright plaintiffs -- from knowingly continuing such erroneous prosecutions in the future, and to encourage current and future innocent defendants to stand up for their own innocence and advance meritorious defenses and to maintain the proper administration and balance of copyright law. Thus, for equitable, compensatory, and deterrence reasons, the court should award fees to Mr. Maness.

## FACTUAL & PROCEDURAL BACKGROUND

### A. MALIBU MEDIA VOLUNTARILY DISMISSED TWO SEPARATE COMPLAINTS, INCLUDING IDENTICAL CLAIMS OF DIRECT INFRINGEMENT AGAINST MR. MANESS

On April 3, 2012, Malibu Media filed its first complaint against 17 Doe defendants in action number 1:12-cv-00839 (hereafter "first action") (Exhibit A.) Malibu Media associated John Doe number 11 with Mr. Maness' IP address of 98.245.76.1. (*Id*., at  Exhibit A.) In this first action, Malibu Media claimed that the purported copyright to its adult video entitled "Veronika Coming Home" was being infringed by the Doe defendants including John Doe 11. (*Id*.) Malibu Media alleged a claim for direct copyright infringement. (*Id*., at ¶¶ 45-51.) Malibu Media also alleged a claim for contributory infringement. (*Id*., at ¶¶ 52-61.) Malibu Media's claim for contributory infringement incorporated by reference all the claims alleged in its direct copyright infringement claim. (*Id*., at ¶ 61.)  Furthermore, as to each claim, Malibu Media alleged that "the infringement complained of [] by each of the Defendants was part of a series of transactions, involving the exact same piece of Plaintiff's copyrighted Work, and was accomplished by the Defendants acting in concert with each other, and…there are common questions of law and fact;

3

indeed, the claims against each of the Defendants are identical and each of the Defendants used the BitTorrent protocol to infringe Plaintiff's copyrighted Work." (*Id*., at ¶ 10.) In Malibu Media's first action it was granted leave by this Court to conduct early discovery permitting it to serve subpoenas on various Internet Service providers to obtain the subscriber information. (Exhibit B.) On or about May 25th, 2012, Mr. Maness' subscriber information was turned over to Malibu Media. (Exhibit C). The total damages threatened against Mr. Maness in the first action -- not accounting for potential fees and costs -- was approximately $150,000. On August 1, 2012, Malibu Media voluntarily dismissed Mr. Maness identified as John Doe 11 without prejudice in the first action. (Exhibit D.)

On July 18, 2012, Malibu Media filed its second complaint against Mr. Maness in the current action (hereafter "second action"). Malibu Media again identified Mr. Maness by IP address of 98.245.76.1. (Complaint at ¶ 8.) In the second action, Malibu Media claimed that the purported copyright to its adult video entitled "Veronika Coming Home," among others was being infringed by the Mr. Maness. (*Id*., at Exhibit B.) Malibu Media alleged a claim for direct copyright infringement. (Complaint at ¶ 8.) The total maximum damages threatened against Mr. Maness in the second action -- not accounting for potential fees and costs -- was well over a million dollars or approximately $1,050,000.   Malibu Media voluntarily dismissed without prejudice the second action in its entirety. (Exhibit E.)

**B. MR. MANESS WAS REPEATEDLY PRESSURED TO SETTLE FOR THOUSANDS OF DOLLARS DESPITE NUMEROUS OFFERS TO PROVIDE EXCULPATORY EVIDENCE**

On June 6, 2012, Mr. Maness received a call at his home from a person identifying herself as Lauren Michaels.[2] Ms. Michaels indicated she represented Malibu Media and then

---

[2] On information and belief Ms. Michaels is neither an attorney nor an employee of Malibu Media, but is instead a third party independent "settlement negotiator" that is hired to pressure punitive defendants into settling.

proceed to solicit a settlement claiming Mr. Maness had downloaded several hard-core pornographic works allegedly owned by Malibu Media. (Maness Decl ¶ 1; Exhibit G - which is a true and correct copy of Mr. Maness' contemporaneous notes.) Mr. Maness indicated that he did not download any type of movie through the internet and that to his knowledge during the time of the alleged infringement his computer had been "hacked" and was not even accessible and that this hacking incident required the installation of an entirely new operating system. (Maness Decl. ¶ 2.) Mr. Maness also explained that at times his wireless router had been "open." (*Id.* at ¶ 3.) Ms. Michaels instructed Mr. Maness to contact his ISP, in this case Comcast, to determine if his IP address was static or dynamic inferring that if his IP address was dynamic such a suit could be "challenged" and that Malibu Media did not want to waste their time, effort and money on a case that may be untenable. (*Id.* at ¶ 4, Exhibit H - which is a true and correct copy of a contemporaneous email sent by Mr. Maness to his family.)

On June 28, 2012, Mr. Maness sent a communication to Malibu Media's Colorado counsel Mr. Kotzker again outlining the exculpatory evidence previously communicated to Ms. Michaels, as well as offering documentary evidence of the same. Mr. Maness further offered to show that a new operating system had to be installed as a result of a hacking/malware incident. (Decl. Maness ¶ 5; Exhibit T). The communication also indicated that Mr. Maness' IP address was dynamic in nature making any case against Mr. Maness, by Malibu Media's own representations a waste of time, money and effort. (*Id.*; *Id.*). Neither Mr. Kotzker nor Ms. Michaels responded to this offer. (*Id.*).

On July 7, 2012, Mr. Maness received another phone call from a person identifying herself as Elizabeth Jones.[3] Mr. Maness reiterated his innocence and again explained the nature

---

[3] On information and belief Ms. Jones is neither an attorney nor an employee of Malibu Media but is instead a third party "settlement negotiator" that is hired to call and pressure punitive defendants into settling copyright claims.

of the exculpatory evidence previously communicated to Ms. Michaels and Mr. Kotzker, as well as offering documentary evidence of the same. (Decl. Maness ¶ 6.) (Exhibit J - which is a true and correct copy of a contemporaneous email sent by Mr. Maness to his family.) Mr. Maness again offered access to his computer files for a complete forensic analysis. (Decl. Maness ¶ 7.) Mr. Maness further indicated that he did not even know what a "torrent" was. (*Id.*; *Id.* at ¶ 1.) Ms. Jones threatened that if he didn't pay they would sue him and that he would need to "hire an attorney" and that this "would be even more expensive than settlement." (*Id.* at ¶ 8; *Id.* at ¶ 2.) Ms. Jones indicated that even with such exculpatory evidence Malibu Media would still view him as solely responsible. (*Id.*; *Id.* at ¶ 3) Mr. Maness declined to pay for something he did not do. (*Id.*; *Id.* at ¶ 2.)

On September 9, 2012, Mr. Maness again attempted to communicate directly to Malibu Media's counsel, Mr. Kotzker reiterating his offer to <u>personally deliver</u> all internet capable devices from his home to the place of Mr. Kotzker's choosing for inspection by him directly or his designated agent. (Maness ¶ 9.)(Exhibit K ¶ 4.)(emphasis added). Mr. Maness also offered to sign an affidavit confirming that he did not download the work(s) in question, nor was he aware of who did -- if such an incident even occurred -- and that he had neither tampered with, nor destroyed any evidence. (*Id.* at ¶ 10; *Id.* at ¶ 5.) Mr. Kotzker again did not respond. (*Id.* at ¶ 11)

**C.  MALIBU MEDIA'S CONTINUALLY REFUSED TO COMPLY WITH ITS RULE 11 OBLIGATIONS**

Nearly a month later, on October 3, 2012 after securing an informal agreement to represent Mr. Maness by defense counsel pending a conflict check, Mr. Maness again reiterated his offer to provide exculpatory evidence and that he was preparing to contest the allegations leveled against him. (Maness Decl. ¶ 12)(Exhibit L.) Defense counsel's name was prominently included at the top of that email. (*Id.*) This was the first indication that Mr. Maness had retained

counsel and planned to contest the matter. Surprisingly, the very next day, on October 4th, 2012, reversing months of ignoring or refusing Mr. Maness' pleas to examine his computer and network Mr. Kotzker changed course and indicated that his client would, in fact, agree to examine his computer(s). (Exhibit L).

One week later on October 10, 2012, Mr. Maness appeared *pro se* in this Court for a status conference.[4] Mr. Maness again reiterated to this Court the existence of exculpatory evidence for not only himself but the other members of his home.[5] (Maness Decl. ¶ 13) Consistent with Malibu Media's prior offer, Mr. Maness brought his computer for inspection. (Exhibit M: Minute Order Dck. 18; *Id.*) After the meeting, Mr. Maness and counsel for Malibu Media met and the offer to inspect his computer was not pursued. (Decl. Maness ¶ 14.) Counsel for Malibu Media indicated that he would have to discuss any settlement matters with his client. (*Id.*) Mr. Maness suspected from this action that Malibu Media had never really intended in good faith to inspect his computer or review any exculpatory evidence. (*Id.*) Two days later on October 12, 2012, counsel for Malibu Media made a settlement offer to Mr. Maness. As an explicit part of this offer Mr. Maness would be required to sign a confidentiality agreement as to the terms of the settlement. (Decl. Maness ¶ 15; Exhibit N.) While initially hopeful to put the ordeal behind him, upon reflection, Mr. Maness elected to refuse any settlement offer containing a confidentiality clause. (*Id.*; *Id.*)

Apart from the obvious appearance of guilt and the damage that had already been done to his reputation in the community, agreeing to such confidentiality would adversely affect Mr.

---

[4] Mr. Maness' counsel had already agreed to represent him in the matter but was unable to attend the conference or notice defense counsel of the representation as he was at the hospital for the birth of his fourth child. (Decl. Kerr ¶ 16.) As Mr. Maness had nothing to hide from judicial inquiry, defense counsel did not think it was necessary to delay the status conference or inspection of his computer.

[5] Mr. Maness wife and agreed to sign affidavits that she had never downloaded anything from a BitTorrent or other program in her life. Mr. Maness's son also stood ready to provide numerous pieces of documentary evidence, including credit card receipts that he was not even in town on some of the alleged dates of infringement.

Maness' business interests. Mr. Maness is a geologist by trade, and is the owner of several small businesses in the mining and energy sector. (Decl. Maness ¶ 16.) The success of these businesses can be dependant on obtaining government contracts and/or working directly with government contractors. (*Id*. at ¶ 17.) Some of these business opportunities are with the U.S. Department of Defense, and Energy as well as the United Nations. (*Id*.) A lawsuit alleging the illegal infringement of hardcore pornography, as in this case, would be discovered as part of any due diligence efforts on the part of such parties and would severely limit if not outright disqualify him from such business opportunities. (*Id*.) In addition, Mr. Maness has previously been granted top secret level clearances. (*Id*.) Mr. Maness might need to renew this clearance in the near future. (*Id*.) A confidential settlement of the nature sought by Malibu Media would almost certainly disqualify him from renewing such clearances causing great personal and economic harm. (*Id*.)

On the afternoon of Friday October 12th, 2012, Mr. Maness' counsel noticed representation and conveyed this rejection and offered to discuss why he could not accept such a confidentiality provision. (Exhibit N.) Mr. Maness' counsel also indicated in writing that with a response deadline just 5 days away -- two of those days falling on the weekend, and having just had his fourth child that very week -- he had already begun preparing a response. Counsel for Malibu Media made no additional efforts to contact defense counsel on this matter. Defense counsel immediately began preparing a motion to dismiss the claims pursuant to Fed.R.Civ.P. 12(b)(6). (Dck. No. 22.)

**D. MALIBU MEDIA VOLUNTARILY DISMISSED ITS SECOND COMPLAINT AGAINST MR. MANESS IN AN EFFORT TO CUT ITS LOSSES AND RUN OUT OF COURT, USING RULE 41 AS AN EMERGENCY EXIT**

On October 17th, 2012, counsel for Mr. Maness forwarded a draft version of Mr. Maness' motion to dismiss to Malibu Media's counsel pursuant to Local Rule 7.1. Counsel for Malibu Media, for the first time disclosed that it had unilaterally dismissed the second action against Mr. Maness in its entirety without prejudice. (Dck. No. 20). Counsel for Malibu Media did not provide prior notice or any other indication -- as a matter of right or courtesy -- that they intended to dismiss Mr. Maness. Furthermore, Malibu Media's counsel knew that defense counsel would not be notified of the dismissal by ECF as he had not yet made an appearance in the case.

That same day counsel for Mr. Maness contacted Malibu Media indicating that he was authorized to, and would seek attorneys' fees and costs. In response, Malibu Media requested an itemization of fees for consideration. Mr. Maness offered in good faith, a settlement compromise whereby he would affirmatively waive any continuing right to fees, as well as all prior accrued costs in exchange for a reduced fee amount. (Decl. Maness ¶ 18.) Malibu Media again never responded.

## <u>LEGAL ARGUMENT</u>

Federal Rule of Civil Procedure 54(d) permits a prevailing party to recover the costs entailed with representation as well as attorney's fees. *See Homeward Bound, Inc. v. Hissom Mem'l Ctr.,* 963 F.2d 1352, 1355 (10th Cir.1992) (articulating the lodestar standard of taking the number of hours reasonably expended on a case and multiplying it by a reasonable hourly rate). The Copyright Act also authorizes the court to "award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505; *Fogerty v. Fantasy, Inc.*, 510 U.S. 517,

534 n.19 (1994). Mr. Maness is the "prevailing party" in these matters, and other equitable factors strongly favor a fee award here. Malibu Medias' actions, and those of its representatives in this case, further justify an award of fees under the Court's inherent federal statutory authority pursuant to 28 U.S.C. §1927, Rule 11 as well as the Court's ability to impose appropriate sanctions.

## I.  MR. MANESS IS THE PREVAILING PARTY

Mr. Maness is the prevailing party in this case and is entitled to an award of costs. Under the controlling law this Court, "a defendant is a prevailing party under Rule 54 when, in circumstances not involving settlement, the plaintiff dismisses its case against the defendant, whether the dismissal is with or without prejudice." *Moore v. Jackson*, 2009 U.S. Dist. LEXIS 68480, at *4 (D. Colo. July 28, 2009)(citing *Cantrell v. Int'l Bhd. of Elec. Workers*, 69 F.3d 456, 456 (10th Cir. 1995)(en banc)). Not only is Mr. Maness entitled to an award of costs based on Malibu Media's prior dismissal, but Fed.R.Civ.P. 54 "makes the award of costs presumptive." *Mitchell v. City of Moore, Oklahoma*, 218 F.3d 1190, 1204 (10th Cir. 2000).

### A.  MALIBU MEDIA'S DISMISSAL OF ITS SECOND ACTION IS AN ADJUDICATION ON THE MERITS PURSUANT TO FED.R.CIV.P. 41(a)(1)(B)

Mr. Maness has prevailed on the merits against Malibu Media. A plaintiff may dismiss an action without a court order by filing a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment. Fed. R. Civ. P. 41(a)(1)(A). "Unless the notice … states otherwise, the dismissal is without prejudice." (Fed. R. Civ. P. 41(a)(1)(B).) "But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits." *Id*. (emphasis added.); *Burnett v. Perry Mfg*., 151 F.R.D. 398, 403-404 (D. Kan. 1993).

Seeking to avoid a disfavorable judgment on the merits against what it knew to be an innocent Defendant, Malibu Media dismissed its second action in an effort to "cut its losses and run out of court, using Rule 41 as an emergency exit." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 390 (1990). However, the policy and purpose of Rule 41(a)(1) was expressly designed by Congress to limit a plaintiff's ability to repeatedly dismiss an action and curb abuses of the judicial system. *Id.* at 397; *see also Poloron Products, Inc. v. Lybrand Ross Bros. & Montgomery*, 534 F.2d 1012, 1017 (2d Cir. 1976)(the primary purpose of the "two dismissal" rule is to prevent an unreasonable use of the plaintiff's unilateral right to dismiss an action prior to the filing of the defendant's responsive pleading.) Under the Tenth Circuit's controlling interpretation of this "two dismissal rule," Malibu Media's second voluntary dismissal of Mr. Maness is "with prejudice." *Brown v. Hartshorne Public School Dist.* #1, 926 F.2d 959, 961 (10th Cir. 1991). A "dismissal with prejudice operates as a final adjudication on the merits, and is thus a final judgment." *Schmier v. McDonald's LLC*, 569 F.3d 1240, 1242 (10th Cir. Colo. 2009) (internal quotation marks omitted).

### B. MALIBU MEDIA'S FUTURE CLAIMS AGAINST MR. MANESS ARE FOREVER BARRED BY RES JUDICATA

Having obtained a final judgment on the merits, Malibu Media is forever barred from bringing the same claims against Mr. Maness. Although neither the Supreme Court nor the Tenth Circuit has specifically addressed the meaning of "same claims" for the purposes of Rule 41(a)(1)(B), the Ninth Circuit, which appears to have the most extensively developed case law on the subject, has analogized the Rule 41(a)(1)(B) two dismissal rule to the res judicata inquiry. *Commercial Space Mgmt. Co., Inc. v. Boeing Co.*, Inc. 193 F.3d 1074, 1076 (9th Cir. 1999). Following this sound judicial guidance, it is clear that Malibu Media's claims are forever barred under Tenth Circuit law related to res judicata. An analysis of these points follows.

11

### 1. There Exists Identity of the Claims

The Tenth Circuit has adopted the transactional approach of the Restatement (Second) of Judgments to determine what constitutes a "cause of action" for res judicata purposes. *King v. Union Oil Co. of Calif.*, 117 F.3d 443, 445 (10th Cir. 1997). The "transactional" approach provides an identity of claims which applies when:

> "[A]ll or any part of [a] transaction, or series of connected transactions, out of which the action arose. What constitutes a "transaction" or a "series" is to be determined pragmatically considering whether the facts are related in time, space, origin, or motivation, and whether they form a convenient trial unit."

*Id.* at 445. Under this test, the central criterion is that a subsequent claim is precluded if it arises from a nucleus of operative facts common to a former claim. *See* Restatement (Second) of Judgments § 24, cmt. B.

Malibu Media asserted identical claims in its first and second actions. Specifically, Malibu Media alleged direct infringement of its purported copyrighted work of its adult video entitled "Veronika Coming Home," downloaded on February 14, 2012 at 5:59. (Exhibit A at Exhibits 1 and Complaint at Exhibit A.) Likewise, both actions were premised on the same facts that the infringement occurred through the downloading and distribution of the work through the use of BitTorrent software. (*Id.* at ¶¶14-44; *Id.* at ¶¶10-24.) Likewise, both actions alleged infringement associated with Mr. Maness' IP address of 98.245.76.1. (*Id.* at Exhibit A; *Id.* at ¶ 8.) Both actions were supported by identical evidence provided by the same foreign firm, IPP, Ltd. (*Id.* at ¶36; *Id.* at ¶16.) Both alleged willful conduct. (*Id.* at ¶50; *Id.* at ¶36.). In arguing for proper joinder of the first action, Malibu Media asserted that with respect to BitTorrent claims there existed "common questions of law and fact." (*Id.* at ¶10). Thus, both of the dismissed actions were motivated by infringement of the same rights, arise out of the same

transaction/occurrence, possess common questions of law and fact evidence and implicate similar if not identical evidence. As such, identity of claims exists.

### 2. Identity of Parties Exists

Rule 41(a)(1) does not require strict privity. No "same" defendant requirement is read into this rule. *Lake at Las Vegas Investors Group, Inc. v. Pacific Malibu Dev. Corp.*, 933 F.2d 724, 728 (9th Cir. 1991). That the defendant is "substantially the same" is sufficient. *Id*. For example in *Abreu v. Ramirez* the court examined plaintiff's prior lawsuits, and found that he had filed and voluntarily dismissed two prior actions against two named defendants in his present action. 284 F.Supp.2d 1250, 1255, (C.D. Cal. 2003). The court held that "other claims twice dismissed by Plaintiff may be barred under the 'two dismissal rule' even if the defendants named here were not named in the earlier two actions." *Id*.,(citing *Lake at Las Vegas Investors Group* supra. 933 F.2d at 728.) This is because defendants need only be "substantially the same" in order to claim benefit of Rule 41(a) res judicata rule. *Abreu*, 284 F.Supp.2d at 1255 (citation omitted.)

Nothing prevented Malibu Media from substituting in Mr. Maness' name for John Doe 11 at any time during the pendency of its first action. (Exhibit A.) Malibu Media even filed the second action against Mr. Maness <u>while it was still pursing settlement on the first action</u> which was still pending. Malibu Media was in possession of Mr. Maness contact information for nearly 70 days[6] prior to his first dismissal yet made no effort to serve him or replace his John Doe designation in its pleadings.[7] Malibu Media's actions of having third party "settlement

---

[6] 120 days from filing the complaint consistent with dismissal for failure to serve parties under Rule 4(m).

[7] This is especially telling in light of Malibu Media's statement to this Court in its notice of dismissal of the first action that: "Plaintiff recently received the names and identifying information of these Defendants in this case and is unable to coordinate service of process to properly serve these Defendants by the Rule 4(m) deadline." (Exhibit D). Such statement by Malibu Media is demonstrably inaccurate and likely in violation of the Party's obligations of candor towards the Court. Malibu Media further advised the Court that it: "plan[ed] on further investigating and

negotiators" contact and Mr. Maness as the liable "Doe" party associated with IP address 98.245.76.1 confirm that even Malibu Media considered the parties to be the same. Thus, identity between the Doe defendant in Malibu Media's dismissed first action is "substantially the same" as Mr. Maness in this action. As such, given the res judicata effect of Malibu Media's dismissal of its second action, Mr. Maness is the prevailing party.

### C.  MR. MANESS HAS ACHIEVED A FINAL JUDGMENT ON THE MERITS

Malibu Media voluntarily dismissed without prejudice its first action in its entirety. (Exhibit D). Malibu Media voluntarily dismissed without prejudice its second action in its entirety. (Exhibit E). The claims in these two actions are the same, were brought against substantially the same person and are based upon the same set of operative facts and background. As a result, the voluntary dismissal of Malibu Media's second action operated as a final adjudication on the merits and, as such Mr. Maness is entitled to a presumptive award of costs.

## II.  MR. MANESS IS ENTITLED TO AN AWARD OF FEES UNDER SECTION §505 OF THE COPYRIGHT ACT

As a prevailing party Mr. Maness is also be entitled under Section §505 of the Copyright Act to an award of costs. The Copyright Act provides for the imposition of "full costs," including reasonable attorney fees, to the prevailing party. 17 U.S.C. § 505; *Broad. Music, Inc. v. Cleatz Bar & Grill, LLC*, 2012 U.S. Dist. LEXIS 87275 (D. Colo. June 25, 2012. Specifically, the Copyright Act provides for the imposition of costs and attorney's fees in favor of the prevailing party:

> In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs.

confirming the information provided by the Internet Service Provider…" *Id.*. Again, such statement by Malibu Media is demonstrably inaccurate and likely in violation of the Party's obligations of candor towards the Court in light of Malibu Media's past and continued refusal to accept exculpatory evidence.

17 U.S.C. § 505. "Plaintiffs in copyright actions may be awarded attorneys' fees simply by virtue of prevailing in the action: no other precondition need be met…" *Girlsongs v. 609 Indus., Inc.*, 625 F. Supp. 2d 1127, 1132 (D. Colo. 2008)(quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1556 (9th Cir. 1989)).

In similar cases involving prevailing Defendants in mass-copyright infringement cases the courts have awarded discretionary attorneys fees and costs under Section §505. *See e.g. Atlantic Recording Corp. v. Andersen*, 2008 WL 2536834 (D.Or. 2008) (court granted attorneys' fees of $103,175 and costs of $4,659 to prevailing defendant in peer-2-peer (P2P) copyright infringement case); *Capitol Records, Inc. v. Foster* 2007 WL 1028532, (W.D. Okla. 2007) (court granted attorneys' fees to prevailing defendant which ultimately totaled $68,685.23 in P2P copyright infringement case). In light of this persuasive authority, an award of fees is a reasonable exercise of this Court's discretion.

## A. AS A PREVAILING DEFENDANT MR. MANESS IS ENTITLED TO A HEIGHTENED PRESUMPTION TO ENCOURAGE MERITORIOUS DEFENSES AND PREVENT ABUSIVE LITIGATION TACTICS

An award of fees under the Copyright Act is not only a matter of this Court's discretion, Mr. Maness is presumed to be entitled to such an award. In copyright infringement cases, numerous courts within this circuit have observed that "though said to be a matter within the court's discretion, attorney's fees are awarded more often as the rule than the exception." *Walden Music, Inc. v. C.H.W., Inc.*, 1996 U.S. Dist. LEXIS 6622, 1996 WL 254654 (D.Kan.) at *6, quoting *Big Tree Enterprises. Ltd. v. Mabrey*, 1994 U.S. App. LEXIS 36669, 1994 WL 191996 (D.Kan), aff'd 45 F.3d 439 (10th Cir. 1994); see also *Frank Music Corp. v. Sugg*, 393 F.Supp.2d 1145, 1147 (W.D. Okla. 2005).

As a prevailing Defendant, Mr. Maness is further entitled to a heightened presumption of an award of costs including attorney's fees. Particularly instructive for this Court is the decision in *Assessment Technologies of Wi, LLC. v. Wire Data, Inc.*, where the Seventh Circuit held that "[w]hen the prevailing party is the defendant, who by definition receives not a small award but no award, the presumption in favor of awarding fees is very strong." 361 F.3d 434, 437 (7th Cir. 2004). Judge Posner, writing for the majority, worried that "without the prospect of such an award, the party might be forced into a nuisance settlement or deterred altogether from enforcing his rights" because the party "could not obtain an award of damages from which to pay his lawyer—no matter how costly it was for him to defend against the suit." *Id.*

This Court has held likewise in mass-copyright cases mirroring Judge Posner's observations that "[e]ven though copyright law expressly provides for an award of costs and reasonable attorney fees to a party prevailing in its defense of a meritless infringement action, the economic realities of securing counsel and paying in advance the costs of litigation turns this remedy into a Potemkin Village." *Righthaven LLC v. Wolf*, 813 F. Supp. 2d 1265, 1271 n.2 (D. Colo. 2011) (exercising discretion under Section §505 of the Copyright Act specifically "to discourage the abuse of the statutory remedies for copyright infringement.").

Consistent with the Honorable Judge Kane's astute observation, the reality of cases like the instant action is that the innocent, such as Mr. Maness, rarely get a chance to clear their names. Exploiting this fact, when Malibu Media threatens suit against an individual such as Mr. Maness, it makes sure to offer a carefully chosen sum that is substantially smaller than the legal fees required to fight the accusations, even for defendants that are completely innocent. See *K-Beech, Inc. v. Does 1-85*, 2011 U.S. Dist. LEXIS 124581, at *6 (E.D. Va. Oct. 5, 2011)("Some defendants have indicated that the plaintiff has contacted them directly with harassing telephone

calls, demanding $2,900 in compensation to end the litigation.") Perhaps more troubling is the fact that when repeatedly presented with evidence as to a defendant's innocence, Malibu Media simply turned a blind-eye in an effort to push for nuisance-value settlement from the guilty and innocent alike. (See generally Facts & Procedural Background *supra*.)[8]

## B. EQUITABLE CONSIDERATIONS FAVOR AN AWARD OF ATTORNEY'S FEES AND COSTS TO MR. MANESS

Equitable considerations favor an award of attorney's fees to Mr. Maness. In determining the reasonableness of requested fees, the following non-exclusive factors may guide a court's exercise of its discretion: "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1270 n.11 (10th Cir. 2008) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19, (1994).

In *Fogerty*, the Court acknowledged that awarding fees to prevailing defendants in copyright cases could be just as important to furthering the purposes of copyright law as awarding fees to prevailing plaintiffs. Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is particularly important that the goals and boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement. *Id.* at 527. Thus, the Supreme Court has recognized the importance of providing the right incentives to both plaintiffs and defendants to ensure that they

---

[8] *See also* Exhibit O - Declarations of Morgan Pietz; Christina Saunders; David S. Kerr; John Arsenault and Lindsey Maness for an overview of such practices.

will proceed with meritorious claims or defenses without worrying about potential attorney's fees.

### 1.  MR. MANESS SHOULD BE COMPENSATED FOR ASSERTING A MERITORIOUS DEFENSE AND TO DETER SERIAL NUISANCE SUITS

In the present case, equitable discretion and "the considerations of compensation and deterrence" both strongly favor awarding Mr. Maness attorney's fees. First and foremost, regardless of the final sum, an award would provide much needed compensation to Mr. Maness for his personal expenses in defense of Malibu Media's meritless copyright suit against him. This is particularly noteworthy because Mr. Maness elected to defend against the claims without any assurance that such fees would be forthcoming, even though he had communicated his innocence with offers of proof early and often to plaintiff which were repeatedly ignored.

Moreover, Malibu Media's mass-produced lawsuits, numbering in the hundreds in just the last six months alone with no sign of abatement, allow it to take advantage of economies of scale. The marginal cost of each additional lawsuit is minimal for Malibu Media and its contingency fee based counsel, while the return of each settlement is quite high.[9] The economics of this situation provide Malibu Media with strong incentives to sue as many people as it can, without regard to actual guilt. Awarding attorney's fees in this case would cause Malibu Media to more thoughtfully consider the merits of each case before proceeding.

---

[9] Pornography "companies file a single cookie-cutter complaint alleging copyright infringement against tens, hundreds or thousands of individuals based on their IP addresses, paying only a single $350.00 filing fee, and likely employing a contingency fee structure. See James DeBriyn, *Shedding Light on Copyright Trolls: An Analysis of Mass Copyright Litigation in the Age of Statutory Damages*, 19 UCLA Ent. L. Rev. 79, 91 (2012) (noting that in these cases, the contingency fee structure is reversed so that the law firm keeps 70 percent, and explaining that this structure allows copyright holders to "monetize peer-to-peer (P2P) activity and realize revenues from an unexpected source - Internet piracy" *Third Degree Films v. Does 1-47* , 2012 U.S. Dist. LEXIS 142079, 30-33 (D. Mass. Oct. 2, 2012). Defendant would note that evidence exists indicating that this contingency fee is, or had been more on the order of 9 to 1.

To the contrary, innocent defendants like Mr. Maness cannot take advantage of Malibu Media's economies of scale. Only those with significant resources will be able to take a stand against Malibu Media's litigation campaign. Mr. Maness is not one of those people, though he risked a great deal in electing to clear his good name. (Maness Decl. ¶ 19.) Failure to award fees to a prevailing defendant would work a grave injustice, not only upon Mr. Maness and his family, but also upon all future innocent defendants who want to mount a defense but cannot afford the legal costs.

## 2. MALIBU MEDIA'S CASE WAS FRIVOLOUS, UNREASONABLE AND OBJECTIVELY WEAK

Malibu Media's speculation that Mr. Maness committed any act of infringement was frivolous and not offered in good faith. Their continual refusal to accept exculpatory evidence was unreasonable and evidences the frivolous nature of this case. The evidence they did have -- namely the "dynamic" IP address of a 66 year old ISP subscriber who had never even heard of "BitTorrent" -- was, by their own admission objectively weak.

Malibu Media's continued assertions that an IP address is a person, and that this person is an infringer is untenable against the great weight of judicial findings and does not comport with the parties duty of candor to the Court. *See e.g. In re BitTorrent Adult Film Copyright Infringement Cases*, 2012 U.S. Dist. LEXIS 61447, at *9 (E.D.N.Y. 2012)(unambiguously expressing concerns to Malibu Media, LLC and its counsel "that many of the names and addresses produced in response to Plaintiff's discovery request will not in fact be those of the individuals who downloaded "My Little Panties # 2."); *See Hard Drive Prods., Inc. v. Does 1-130*, No. C-11-3826 DMR, 2011 U.S. Dist. LEXIS 132449, at *6 (N.D. Cal. Nov. 16, 2011))(recognizing that ISP subscriber information sought by the plaintiff "has the potential to draw numerous innocent internet users into the litigation.) At the outset, Plaintiff and its counsel

were aware of the significant risk of false positives, yet they "blindly named" Mr. Maness and unreasonably continued to pressure him for an unfair "nuisance settlement" for something that, given a mere 10 minutes he could prove he did not do.

Malibu Media will undoubtedly claim that they were authorized by this Court to obtain Mr. Maness' ISP subscriber information and as such, their actions were reasonable and even sanctioned by this Court. However this argument fails under scrutiny.  First, this Court certainly did not authorize Malibu Media's abusive and unfair litigation actions spanning several months in this case. Second, no good faith basis existed that there was "infringement committed by [Mr. Maness] in this case." (Feiser Decl. ¶18 (Dck.1)).  Malibu Media's entire case against Mr. Maness is based on the unsupported statement that a "computer using the IP address assigned to Defendant" participated in the alleged infringing activity, (*Id*. at ¶19), and that the ISP can "identify the name…of the Defendant." (*Id*. at ¶22). However, there exists no reasonable good faith basis upon which Malibu Media could state that the Defendant, based on an IP address alone, infringed on anyone's work(s). In an identical BitTorrent case, two separate declarations -- herein referred to as Exhibit P and incorporated in their entirety by reference -- provided by experienced and qualified computer science professionals confirm that there is no way that a person in Plaintiff's position could have made the aforementioned claims in good faith. (Decl. Stephen Hendricks ¶10). Indeed, both declarations confirm that it would be impossible to make any such determination. (Decl. Stephen Hendricks ¶10; Decl. John Simek ¶6).[10] Such inaccurate and misleading evidence offered in bad faith to this Court to rationalize *ex parte* discovery cannot support Plaintiff's claims justifying an award of attorney's fees and costs.

Regardless of how and under what justifications Mr. Maness' subscriber information was obtained, Malibu Media was at all times aware of the certainty of the misidentification of

---

[10] Similar to the Defendant referenced in both the Hendricks and Simek declarations, Defendant's ISP is Comcast.

defendants in their drag-net litigation campaign. Indeed, plaintiff's counsel in other identical BitTorrent cases have repeatedly admitted in open court that misidentification of innocent individuals has and will continue to occur. One plaintiff's counsel admitted in open court that:

> "30% of the names turned over by the ISP's are not those of the individuals who actually downloaded or shared copyrighted material."

*Digital Sin, Inc. v. Does 1-176*, 279 F.R.D. 229, 242 (S.D.N.Y. 2012) (citing (1/17/12 Tr. at 16)); *see also Pacific Century Intern. Ltd., v. Does 1-101*, 2011 U.S. Dist. LEXIS 124518, *2 (N.D. Cal. 2011)(noting that Plaintiff disavowed previous representations to the court that the requested discovery would allow it to "fully identify" Defendants and further admitting that the discovery often will not reveal Defendants' identities); *AF Holdings LLC v. Does 1-96*, 2011 U.S. Dist. LEXIS 134655, at *11-12 (N.D. Cal. Nov. 22, 2011)(plaintiff conceded on the record that "the [ISP subscriber] information subpoenaed will merely reveal the name and contact information of the subscriber to the Internet connection that was used to download the copyrighted work, but it will not reveal who actually downloaded the work and therefore who can be named as a defendant."); *Hard Drive Productions, Inc. v. Does 1-130*, 2011 WL 553960, at *2 (N.D. Cal. 2011)("Plaintiff concedes, in some cases the Subscriber and the Doe Defendant will not be the same individual").

In light of these facts, Malibu Media knew or had strong reason to know that innocent individuals were being misidentified, and pressured to settle in the face of public humiliation and financial ruin. Mr. Maness tried repeatedly to clear his name and avoid this fight. Malibu Media simply refused, expecting that, like most defendants Mr. Maness would be cowed by the prohibitive cost of a reasonable defense or the complexity of a *pro se* effort. In light of the inflammatory accusations in this case, and the real harm such false accusations have already

inflicted on Mr. Maness (Maness Decl. ¶ 19), Malibu Media's actions were clearly unreasonable and an award of fees is justified.

Finally, even assuming, *arguendo*, that Malibu Media's actions were wholly reasonable, their claims in both actions could only be characterized as "objectively weak" warranting an award of attorney's fees. (Maness Decl. ¶ 4 - admitting that pursuing someone with a dynamic IP address would be a waste of time, effort and money); *see Garcia-Goyco v. Law Envtl. Consultants, Inc.*, 428 F.3d 14, 20-21 (1st Cir. 2005) (awarding attorney's fees to defendant where plaintiff's copyright claim was "objectively weak"). As a factual matter, Malibu Media knows or should know that a subscriber can be misidentified in multiple ways as an infringer without participating in any infringing behavior, including at least:

> 1. Some members of a swarm simply and automatically pass on routing information to other clients, and never possess even a bit of the movie file;[11]
>
> 2. A client requesting a download can substitute another IP address for its own to a BitTorrent tracker;[12]
>
> 3. A user can misreport its IP address when uploading a torrent file. A user in the network path between the user monitoring IP address traffic and the BitTorrent tracker can implicate another IP address;[13]

---

[11] Sengupta, S. et al., Peer-to-Peer Streaming Capacity, IEEE Transactions on Information Theory, Vol. 57, Issue 8, pp. 5072-5087, at 5073 (Prof. Helmut Bolcski, ed., 2011) ("A [BitTorrent] user may be the source, or a receiver, or a helper that serves only as a relay.").

[12] Michael Piatek et al., *Challenges and Directions for Monitoring P2P File Sharing Networks—or—Why My Printer Received a DMCA Takedown Notice*, 3 (2008), http://dmca.cs.washington.edu/uwcse_dmca_tr.pdf See also, "IP address spoofing" http://en.wikipedia.org/wiki/IP_address_spoofing (Last visited August 2, 2012) (the term IP address "spoofing" refers to the creation of a forged IP address with the purpose of concealing the user's identity or impersonating another computing system.). Specifically, the article concludes: "[W]e find that it is possible for a malicious user (or buggy software) to implicate (frame) seemingly any network endpoint in the sharing of copyrighted materials. We have applied these techniques to frame networked printers, a wireless (non-NAT) access point, and an innocent desktop computer, all of which have since received DMCA takedown notices but none of which actually participated in any P2P networks.

[13] Ibid.

4. Malware on a computer can host and distribute copyrighted content without knowledge or consent;[14]

5. There are reliability issues with using IP addresses and timestamps to identify the correct party;[15]

6. If a subscriber has dynamic IP addressing through its website host, it is sharing an IP address with several other subscribers;[16]

7. Anyone with wireless capability can use a subscriber's "wi-fi" network to access the Internet, giving the impression that it is the subscriber who is infringing;[17] or

8. Human error by IPP, Ltd, Plaintiff and/or the ISP among others.

All of the above facts are publically available and known by Malibu Media and may be considered by this Court in determining the objective strength, or lack thereof of Plaintiff's claims.

### 3. MALIBU MEDIA'S MOTIVATION WAS IMPROPER

Malibu Media not only acted unreasonably, but did so with an improper motivation. It continually harassed Mr. Maness over the course of months, while completely ignoring his desperate offers to prove his innocence as well as the weakness of its own evidence. Plaintiffs "who file cases with extremely weak infringement positions in order to settle for less than the

---

[14] Ibid.

[15] Ibid. ("When IP addresses are assigned dynamically, reassignment of an IP address from an infringing user to an innocent user can cause the behavior of the infringing user to be attributed to the innocent user. Because the monitoring client (copyright holder) records information from the tracker of the BitTorrent client, the information can quickly become inaccurate and will not implicate the correct user.")

[16] "Web hosting service" http://en.wikipedia.org/wiki/Web_hosting_service (Last visited August 2, 2012).

[17] Carolyn Thompson writes in an MSNBC article of a raid by federal agents on a home that was linked to downloaded child pornography. The identity and location of the subscriber were provided by the ISP. The desktop computer, iPhones, and iPads of the homeowner and his wife were seized in the raid. Federal agents returned the equipment after determining that no one at the home had downloaded the illegal material. Agents eventually traced the downloads to a neighbor who had used multiple IP subscribers' Wi-Fi connections (including a secure connection from the State University of New York). See Carolyn Thompson, Bizarre Pornography Raid Underscores Wi-Fi Privacy Risks (April 25, 2011), www.msnbc.msn.com/id/42740201/ns/technology_and_science-wireless/

cost of defense and have no intention of taking the case to trial….is an abuse of the judicial system and threatens the integrity of and respect for the courts." Mem. Op. and Order at 5, *Raylon LLC v. EZ Tag Corp.*, No. 6:09-cv-00357 (E.D. Tex. Mar. 9, 2011), (Dkt. 115). Malibu Media's motivation to press for a profit-seeking "nuisance-value" settlement at all costs while intentionally ignoring the weakness of their claims and any exculpatory evidence is improper and should be deterred. See *Malibu Media, LLC v. Felitti*, 2012 U.S. Dist. LEXIS 103393 (D. Colo. 2012) (characterizing Malibu Media's lawsuit as tantamount to an extortion scheme, noting the near certainty of innocent defendants being accused and pressured into settlement and complaining that this Court is not to be used as a "cog[] in plaintiff's copyright-enforcement business model.")

Under analogous circumstances, courts have recognized that similar motivations underlying serial nuisance copyright suits must be deterred and recompensed by an award of attorneys' fees. *See, e.g., Video- Cinema Films, Inc. v. CNN, Inc.*, 2003 U.S. Dist. LEXIS 4887, at 14-15 (S.D.N.Y. Mar. 31, 2003) (applying the Copyright Act to determine that "[p]laintiff's conduct was nothing more than an obvious effort to use the Copyright Act to secure payment from Defendants…as such Plaintiff's motivation was improper and weighed in favor of an award of attorneys' fees"); *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 894-896 (6th Cir. 2004) (applying the Copyright Act, attorneys' fees were in part appropriate where plaintiff's "choice to sue hundreds of defendants all at the same time, regardless of the strength of the individual claims" resulted in their "dragnet inevitably [sweeping] up parties against whom they had little or no chance of succeeding" and recognizing the District Court's observation that remaining copyright claims against other similarly situated Defendants were "for the sole purpose of extracting settlement based on the cost of litigating further.")

## 4.  MALIBU  MEDIA  SHOULD  BE  DETERRED  FROM  FUTURE ABUSIVE AND UNFAIR LITIGATION TACTICS

Though Malibu Media has a right to sue those who actually infringe on its valid copyrights, it does not have the right to carelessly target innocent defendants and subject them to the costs of defending against baseless accusations. Because of its suspect investigation methods, Malibu Media's vast legal campaign against alleged BitTorrent users acts as a blunt instrument, battering both the innocent and the guilty in broad and indiscriminate strokes. Faced with the Hobson's choice[18] of either settling now or facing large legal costs and potential uncertainty over recovering their attorneys fees, innocent defendants may find themselves making the logical though unsavory choice of settling.[19]

Awarding attorney's fees here also provides the necessary incentives for Malibu Media, (and other similar situated mass-copyright litigants) to exercise greater care in their mass litigation campaigns and avoid bringing similarly frivolous suits in the future. Plaintiff is a well financed corporate entity who can easily afford to bring innumerable suits in their efforts to stamp out all possible sharing of their works on the internet. Defendant, on the other hand, is an innocent individual with limited resources. (Maness Decl. ¶ 19). Unless the court awards Mr. Maness his fees, Malibu Media will continue their campaign unchecked and undaunted. Only a strong fee award can deter such behaviors and prevent future Mr. Maness' from having to subject themselves to this same expensive and draining ordeal.

## 5.  AN AWARD OF ATTORNEY'S FEES TO MR. MANESS WOULD ADVANCE THE POLICIES OF THE COPYRIGHT ACT

Based on outsized statutory incentives, Malibu Media's motivation is clearly to monetize, not protect its works though litigation. Under Malibu Media's new copyright monetization

---

[18] A free choice in which only one option is offered.

[19] Plaintiff's counsel can provide, under seal, declaration evidence at this Court's discretion with examples of such innocent individuals that were forced to make such a choice.

model, Malibu Media -- and their contingency based attorneys -- actually increase their profits with more infringement and more lawsuits and has no incentive to carefully differentiate between the guilty and the innocent. Accepting exculpatory evidence from people like Mr. Maness only serves to waste time and lower margins.[20] However, Copyright protection does not exist to create a secondary litigation-based income stream to rights-holders and should not be endorsed by this Court.

Mass for-profit enforcement of copyrights also cuts against the primary purpose of copyright law and steals from the public the set of benefits copyright law was intended to provide it. "The copyright law . . . makes reward to the owner a secondary consideration….. Creative work is to be encouraged and rewarded, but private motivation must ultimately serve the cause of promoting broad public availability of literature, music, and the other arts." *Sony Corp., v. Universal City Studios*, 464 U.S. 417, 429, 431-32 (1984). The Honorable Judge Posner again noted in *Assessment Technologies,* harm to the public would occur where a copyright owner used "an infringement suit. . . hoping to force a settlement or even achieve an outright victory over an opponent that may lack the resources or the legal sophistication to resist effectively." 361 F.3d at 437.

### III. MR. MANESS IS ENTITLED TO AN AWARD OF FEES UNDER 28 U.S.C. §1927

Regardless of his status as the prevailing party, Mr. Maness is independently entitled to an award of fees and costs under 28 U.S.C. §1927 arising out of Malibu Media's conduct in bringing and prosecuting both actions. Specifically, pursuant to 28 U.S.C. §1927, District Courts possess independent statutory authority to impose sanctions such as attorneys' fees. Specifically, a "district court may assess an award of fees against an attorney appearing before the court if: (1)

---

[20] These motivations are especially troubling, if, as Mr. Maness believes Malibu Media only receives a 10% contingency from each case or settlement resulting in Plaintiff's counsel acting more as a proxy plaintiff in what has likely cease to be a lawsuit but now resembles a joint-business enterprise.

the actions of the attorney multiply the proceedings, and (2) the attorneys' actions are vexatious and unreasonable." *Dreiling v. Peugot Motors of Am., Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985). Sanctions under §1927 are appropriate when an attorney acts "recklessly or with indifference to the law." *Dominion Video Satellite, Inc. v. Echostar Satellite LLC*, 430 F.3d 1269, 1278 (10th Cir. 2005). (*citing Braley v. Campbell*, 832 F.2d 1504, 1511 (10th Cir. 1987). Sanctions are also appropriate "when an attorney is cavalier or bent on misleading the court; intentionally acts without a plausible basis; [or] when the entire course of the proceedings was unwarranted." *Miera v. Dairyland Ins. Co.*, 143 F.3d 1337, 1342 (10th Cir. 1998) (quotations and internal citations omitted). Noteworthy is that a finding of bad faith is not necessary to impose sanctions under §1927. *Hamilton v. Boise Cascade Express*, 519 F.3d 1197, 1202 (10th Cir. 2008).

As noted *supra*, the entire basis for Malibu Media's actions were legally reckless, factually flawed and offered in bad faith. Malibu Media knew, or should have known that thousands of innocent individuals such as Mr. Maness were being identified by their drag-net style litigation tactics yet chose to proceed blindly against him and others. Malibu Media knew or should have known that Mr. Maness had been identified with an dynamic IP address. Malibu Media's by its own admission conceded that such a case based on a dynamic IP address was a waste of time, money and efforts (Maness Decl. ¶ 4). Malibu Media's continued disregard of Mr. Maness' repeated pleas to prove his innocence right up until the 11th hour when a response was due to the Court and it was evident that Mr. Maness had retained counsel to contest the charges, has resulted in the unnecessary accrual of fees by Mr. Maness. Malibu Media's continual pursuit of this case after it clearly became unreasonable to do so justifies an award of fees. *See Sangui Biotech Intern., Inc. v. Kappes*, 179 F. Supp. 2d 1240, 1243-44 (D. Colo. 2002)(sanctions can be

imposed § 1927 can be imposed on counsel who "continues[s] to pursue claims that are no longer reasonable.")

Moreover, Malibu Media had months to accept his offers of proof and refused. To the contrary, Mr. Maness was under no obligation[21] to accept their 11th hour offer, nor should he be prejudiced merely because he elected to refuse such an unreasonable offer that would permanently damage his business and personal interests. (Maness Decl. ¶¶ 16-17); *C.f. Spooner v. EEN, Inc*., 644 F.3d 62, 71 (1st Cir. 2011) (a garden-variety settlement offer made without resort to Rule 68 affords the offeror no similar protection; he cannot reasonably expect to gain the benefits that Rule 68 confers); *Coutin v. Young & Rubicam P.R., Inc*., 124 F.3d 331, 341 & n.8 (1st Cir. 1997).  Moreover, Malibu Media's lack of communication and common courtesy to opposing counsel has further multiplied the proceedings resulting in the unnecessary accrual of fees and costs by Mr. Maness.

These sorts of tactics have unnecessarily burdened Mr. Maness with undue legal costs and emotional distress, especially when Malibu Media had been offered on multiple occasions uncontested evidence of Mr. Maness' non-infringement. Malibu Media's determination to pursue, by their own admission a frivolous suit unnecessarily burdens the courts and clogs up judicial resources.

## IV.  MR. MANESS IS ENTITLED TO AN AWARD OF FEES UNDER THE COURT'S INHERENT POWER TO IMPOSE APPROPRIATE SANCTIONS

Malibu Media's abusive and inappropriate litigation behavior makes this an exceptional case warranting an award of fees. In such exceptional cases, the Court "ha[s] the inherent power to impose a variety of sanctions on both litigants and attorneys to regulate [its] docket, promote judicial efficiency and deter frivolous findings." *Houston v. Mile High Adventist Academy*, 872

---

[21] This is contrary to Malibu Media's continuing Rule 11 duties to investigate facts and evidence presented to them.

F. Supp. 829, 838 (D. Colo. 1994). The inquiry with regard to sanctions pursuant to a court's inherent power is whether a person has abused the judicial process by acting "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991); *Steinert v. Winn Group, Inc.,* 440 F.3d 1214, 1223 (10th Cir. 2006).

The Tenth Circuit has, on multiple occasions, affirmed the Court's inherent power to impose attorneys' fees for such exceptional cases. *See Glass v. Pfeffer*, 849 F.2d 1261, 1264-66 (10th Cir. 1988). Specifically, to ensure that the Courts are used as a forum for the orderly resolution of good faith disputes, and to prevent and deter misuse of the judicial system, District Courts are specifically granted "inherent powers" to "levy sanctions in response to abusive litigation practices." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764-65, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980); *see also Morganroth & Morganroth v. DeLorean*, 213 F.3d 1301, 1317 (10th Cir. 2000) (holding that "federal courts have . . . inherent power to sanction parties for bad faith conduct in litigation"). Such inherent powers specifically include the authority to assess fees. *Link* v. *Wabash R. Co*., 370 U.S. 626, 632 (1962).

### A. MALIBU MEDIA HAS ENGAGED IN ABUSIVE AND INAPPROPRIATE LITIGATION BEHAVIOR MAKING THIS CASE EXCEPTIONAL

As outlined *supra*, an award of fees would be an equitable use of this Court's power because, as the record shows, this case is a prime example of Malibu Media's inadequate investigation -- if not willful blindness -- into whether the defendants it names are actually the ones doing the file sharing. Plaintiff, Malibu Media has already been judicially warned that the continued refusal to accept exculpatory evidence from plaintiff's such as Mr. Maness is

inappropriate, abusive and unfair.[22] [23] *See In re BitTorrent*, supra at \*19 (E.D.N.Y. 2012) (noting that "plaintiffs have employed abusive litigations tactics to extract settlements from John Doe defendants"). Indeed, the *In re BitTorrent* court went so far as to describe Malibu Media's justifications for such tactics as "rambling" and "farcical." *Id*. at n7. More on point, the Court noted that at least one defendant -- much like Mr. Maness -- offered unfettered access to their network and computers coupled and other exculpatory evidence but was flatly refused. *Id*. at 28. ("In this case, John Doe #16 offered the Plaintiff "unfettered access" to his computer and employment records demonstrating that he was not at home at the time of the downloading.). Such a pattern of behavior can only support a finding of bad faith on the part of Malibu Media.

One of the other tactics directed to Mr. Maness, that Judge Brown in the *In Re BitTorrent* decision found so "improper" was the use of "settlement negotiators" whom, notwithstanding a John Doe's protestations of innocence, pressure to settle with Doe defendants so that they can "avoid digging themselves out of the morass plaintiff is creating." *Id.* at. pp. 8–9, 17, (*citing On The Cheap, LLC v. Does 1-5011*, 2011 WL 4018258, at \*4 (N.D. Cal. Sept. 6, 2011). This abusive and inappropriate litigation behavior has occurred, and is continuing here in Colorado and around the country and should be deterred by this Court with award of fees and costs to Mr. Maness. (*See* Exhibit O Declarations of Morgan Pietz; Christina Saunders; David S. Kerr; John Arsenault and Lindsey Maness.)

---

[22] Plaintiff and its counsel, Mr. Kotzker, are also currently under the threat of sanctions for disobeying a direct Court order further casting doubt on Plaintiff's sincerity in vindicating its right.  See *In re BitTorrent Adult Film Copyright Infringement Cases*; Order; Case No. 2:12-cv-01147-JS-GRB Dck. 9 (Filed 07/31/12) ("Less than three months after addressing concerns about potentially abusive litigation tactics by plaintiffs in these actions, this Court is *again* confronted with indicia of improper conduct by plaintiffs' counsel, to wit: plaintiffs' counsel apparently ignored, or tried to circumvent, the very safeguards the undersigned put in place to help prevent unfair litigation tactics while permitting plaintiffs to pursue their claims").

[23] Just this month, Malibu Media, in a judicially ordered "bell-weather" trial in the District Court of Pennsylvania, admitted on the record to filing false statements, submitting filings drafted by one attorney and filed under another attorney's ECF, and filed documents under the signature of one attorney who lacked knowledge of the statements averred. *Malibu Media v. John Does 1-14,* Civil No. 2:12-cv-02084-MMB (Dck. No.'s 32, 34 & 37).

Malibu Media, has not only not attempted to enforce its alleged rights, but has actively encouraged and facilitated infringement of its works to create a secondary litigation-based stream of revenue. Specifically, a claim for infringement requires the copying of a protected work without the consent, authorization or permission of the owner. *See Schmidt v. Holy Cross Cemetary, Inc.*, No. 92-2436-JWL, 1993WL 512414, at *2 (D. Kan. Nov. 2, 1993) (reciting the elements of copyright infringement). In the context of both actions Malibu Media's statements that it did not authorize, permit or consent to Defendants' copying of its Works. (Exhibit A ¶ 48; Complaint ¶ 30.) Malibu Media's motivations are belied by the allegations in its complaints in other civil actions that it knew months before Mr. Maness is alleged to have copied the works that the Works were available on websites and accessible and subject to copying through use of BitTorrent programs. *See*, *e*.g., Complaint filed February 15, 2012 in Malibu Media LLC v John Does 1-29, Case 1:12-cv- 00397-WJM-MEH, ¶2 ("Throughout this Complaint the word 'Works' refers to 57 movies contained on the subject website."); ¶ 15 ("Plaintiff registered 11 of the 57 movies contained on the subject website with the United States Copyright Office."); ¶ 29-30 ("'Torrent Sites' are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol …. Upon information and belief, each defendant went to a torrent site to upload and download Plaintiff's copyrighted Works").

With knowledge that "Torrent Sites" were making its "X-Art Siterip #1" Works available for copying, Plaintiff apparently did nothing to protect its Works. Rather, Malibu Media permitted the "Torrent Sites" to continue to make the "X-Art Siterip #1" Works available for copying. The allegations of both actions and other companion complaints reveal that the only actions taken by plaintiff were to register additional movies that comprised the "X-Art Siterip

#1" Works, to retain the services of IPP, Limited to monitor copying and track the Unique Hash Number, and to commence litigation against unsuspecting defendants who may or may not have used their IP address to copy the Works. As such it appears that Malibu Media, in order to establish a secondary litigation based profit stream "has aided [a party] in infringing or otherwise induced it to infringe or has committed covert acts such as holding out ... by silence or inaction." *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115-17 (D. Nev. 2006) *citing Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 753 (E.D. Mich. 1998). Such actions are contrary to the purposes of both the Copyright Act and should be deterred with an award of fees to Mr. Maness.

## V. MR. MANESS IS ENTITLED TO AN AWARD OF FEES UNDER RULE 11

Malibu Media's conclusory allegations that Mr. Maness, as merely an internet subscriber is the "most likely infringer" is not supportable under Fed.R.Civ.P. 11 justifying a fee award. (Complaint ¶ 23.) As noted *supra*, blindly naming Mr. Maness in this action without any evidentiary basis for such a claim violates Rule 11's requirement that "the factual contentions (i.e., that the defendant in this case was personally involved in uploading and downloading copyrighted material) have evidentiary support . . ." Specifically, under this rule, an attorney's signature on a motion or pleading means "that to the best of his or her knowledge, information, and belief there is good ground to support the contentions in the document, both in terms of what the law is or should be and in terms of the evidentiary support for the allegations, and that he or she is acting without an improper motivation." Charles Alan Wright & Arthur R. Miller, *5A Fed. Prac. & Proc. Civ.* § 1335 (3d ed.).

Plaintiff, Malibu Media, LLC, has been specifically warned in an identical BitTorrent case of the potential for sanctions for incorrectly identifying and naming defendants. *See Malibu Media, LLC v. Doe*, 2012 U.S. Dist. LEXIS 110668, at *6-7 (M.D. Fla. Aug. 7, 2012) ("The

plaintiff shall inform each John Doe defendant of the potential for sanctions under Rule 11, Fed.R.Civ.P., if the John Doe defendant is incorrectly identified"); *see also e.g. Hard Drive Productions v. Does* 1-48, No. 11-9062, 2012 U.S. Dist. LEXIS 82927, 2012 WL 2196038, *6 (N.D. Ill. June 14, 2012) (warning plaintiff to consider Rule 11 before naming defendant who disputed that he had illegally downloaded pornographic movie).[24]

Apart from incorrectly identifying and naming Mr. Maness without evidentiary support, Malibu Media affirmatively ignored not only its pre-filing obligations, but its continuing obligations to investigate and discover the facts of the case.[25] Specifically, Rule 11 provides that an attorney may not submit a pleading, motion or other paper, "unless to the best of the signer's knowledge, information, and belief formed <u>after reasonable inquiry it is well grounded in fact</u>." (emphasis added) As outlined *supra*, by the time Malibu Media named Mr. Maness in the second action it had received at least three concrete offers of unfettered access to his networks and computer devices. These offers were ignored. Even, after being named in the second action, Malibu Media was offered at least three more times unfettered access to Mr. Maness' networks and computer devices, in one case offering to <u>personally deliver such devices to Malibu Media's counsel</u>, and in another case <u>actually delivering such devices to Malibu's counsel in open court</u>.

Ignoring at least 6 concrete offers of unfettered access to Mr. Maness' computers and network is not a "reasonable inquiry," and Malibu Media's pleadings were not "grounded in fact[s]." *Harrison v. Luse*, 760 F. Supp. 1394, 1399 (D. Colo. 1991)(The attorney must "stop,

---

[24] As yet another alternate theory justifying an award of fees, under Colorado law, a court may award reasonable attorneys' fees in any civil action of any nature. Colo. Rev. Stat. § 13-17-102(1) (1987 Repl. Vol.). Specifically, the court shall award reasonable attorneys' fees against any attorney or party who has brought or defended a civil action, either in whole or in part, that the court determines lacked substantial justification. Colo. Rev. Stat. § 13-17-102(2) (1987 Repl. Vol.). Harrison v. Luse, 760 F. Supp. 1394, 1400 (D. Colo. 1991).

[25] If Malibu Media concedes that it blindly named Mr. Maness knowing him to not to be the actual infringer but merely as a vehicle to get at the "real infringer" such actions, especially in light of its refusal to accept exculpatory evidence would indicate that the lawsuit was merely meant to improperly harass Mr. Maness further warranting an award of fees.

look and listen" before signing a document subject to Rule 11.) Such actions are objectively unreasonable, frivolous and evidence an improper motivation not to litigate the merits of the case, but merely to secure a nuisance value settlement. *See Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988)("challenged conduct is evaluated under a standard of objective reasonableness, that is, whether a reasonable attorney admitted to practice before the District Court would file such a document.).

Moreover, any claim of good faith belief will not shield Malibu Media from its' unreasonable actions. See *Burkhart v. Kinsley Bank*, 804 F. 2d 588 (10th Cir. 1986)(reasonableness is determined by an objective standard, a showing of subjective bad faith is no longer required.); *see also White v. General Motors Corp., Inc*., 908 F.2d 675, 680 (10th Cir. 1990)("A good faith belief in the argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances."). Malibu media's actions were objectively unreasonable. It failed to conduct the required pre-filing inquiry and filed documents with the Court that were not grounded in fact and at meant to improperly harass Mr. Maness. Indeed, Malibu Media expended great efforts to remain willfully blind to the facts of this case contrary to their Rule 11 obligations. No objectively reasonable, competent attorney in this jurisdiction would have filed this case against Mr. Maness. As such, an award of fees under Rule 11 is justified.

## VII. THE AWARD OF ATTORNEY'S FEES AND COSTS IS REASONABLE

As of November 8, 2012 Mr. Maness is entitled to a total fee award of $21,444.50.[26] (See David Kerr Decl. ¶ 1-5; and Exhibit Q). Before awarding attorneys' fees, the Court follows the

---

[26]     The Supreme Court has held that what constitutes a "reasonable" fee award under any federal fee-shifting statute applies with equal force to all federal fee-shifting statutes. *City of Burlington v. Dague*, 505 U.S. 557, 562 (1992) (holding that language about what is a "reasonable" fee award in case law applies equally to all federal fee-shifting statutes). Thus, this precedent concerning the reasonableness of including the time spent moving and

three-step process set forth in *Ramos v. Lamm*, 713 F.2d 546 (10th Cir. 1983), *overruled on other grounds by Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 483 U.S. 711 (1987).

The first step is to determine the number of hours reasonably spent by the prevailing party's counsel. *Malloy v. Monahan*, 73 F.3d 1012, 1017 (10th Cir. 1996); *Ramos*, 713 F.2d at 553. Factors considered in a reasonableness determination include: (1) whether the amount of time devoted to a particular task appears reasonable in light of the case's complexity, the strategies pursued, and the responses necessitated by an opponent's maneuvering; (2) whether the amount of time spent is reasonable in relation to counsel's experience; and (3) whether the billing entries are sufficiently detailed, indicating how much time was allotted to specific tasks. *Rocky Mountain Christian Church v. Bd. of Cnty. Comm'rs of Boulder Cnty.*, No. 06-cv-00554, 2010 WL 3703224, at \*2 (D. Colo. Sept. 13, 2010) (unpublished).

In this case, counsel's customary market rate of $295 per hour is reasonable for an attorney specializing in intellectual property. (*Id*. ¶¶7-8). This determination is based on counsel's credentials, expertise in intellectual property matters, and depth of experience in cases defending against mass-copyright litigants. (*Id*. ¶ 11-12). Specifically, the rate charged falls within the range of rates charged by intellectual property attorneys of comparable skill, experience, and reputation for the performance of similar services in bringing copyright infringement claims. (Decl. Kerr, ¶ 7-8; see also *Ward v. Siebel*, 2012 U.S. Dist. LEXIS 83171, \*11-13 (D. Colo. June 15, 2012) (attorneys at an intellectual property law firm in Colorado billed at hourly rates of $410-760). Also, in intellectual property cases, courts frequently use the survey of the American Intellectual Property Law Association (AIPLA) in determining a reasonable rate. *see, e.g.*,

---

applying for attorney's fees under 42 U.S.C. § 1988, or a similar federal fee-shifting statute, applies with equal force to 17 U.S.C. § 505. As such, the time spent by the Firm in preparing this Motion should be included in the Court's award of attorney's fees and costs. In this case Mr. Maness is entitled to an award under at least 6 legal theories that all required extensive legal research and factual analysis.

*Takeda Chem. Indus., Ltd. v. Mylan Labs, Inc*., 2007 WL 840368, at *3 (S.D.N.Y. Mar. 21, 2007) ("In determining a reasonable rate, a court may refer to American Intellectual Property Law Association ("AIPLA") surveys.") (citing *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988) ("As the law makes clear, the district court properly considered the [AIPLA] surveys")); *see also Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc*., 51 F. Supp. 2d 302, 304-305 (S.D.N.Y. 1999) ("In determining a reasonable rate, the court may refer to American Intellectual Property Law Association (AIPLA) surveys ...") The rates for Mr. Kerr are consistent with the rates reported in a recent AIPLA survey and reflect the specialized nature of intellectual property law services. (*Id*.,; Exhibit R).

Summarized below, the amount of billed-time is further explained in detailed billing records and is reasonable. (Id. ¶ 12; Exhibit Q.)

| DATE | BILLABLE TIME | RATE | ORIGINAL TOTAL | ADJUSTED RATE | LODESTAR MULTIPLIER |
|---|---|---|---|---|---|
| 10/12/2012 | 1.5 | $295 | $442.50 | $331.88 | $497.81 |
| 10/13/2012 | 4.9 | $295 | $1,445.50 | $1,084.13 | $1,626.19 |
| 10/14/2012 | 6.5 | $295 | $1,917.50 | $1,438.13 | $2,157.19 |
| 10/15/2012 | 6.4 | $295 | $1,888.00 | $1,416.00 | $2,124.00 |
| 10/16/2012 | 1.8 | $295 | $531.00 | $398.25 | $597.38 |
| 10/17/2012 | 5.1 | $295 | $1,504.50 | $1,128.38 | $1,692.56 |
| 10/17/2012 | 1.3 | $180 | $234.00 | $175.50 | $263.25 |
| 10/18/2012 | 0.3 | $295 | $88.50 | $66.38 | $99.56 |
| 10/19/2012 | 2.9 | $295 | $855.50 | $641.63 | $962.44 |
| 10/22/2012 | 0.3 | $295 | $88.50 | $66.38 | $99.56 |
| 10/29/2012 | 4.52 | $295 | $1,333.40 | $1,000.05 | $1,500.08 |
| 10/30/2012 | 2.95 | $295 | $870.25 | $652.69 | $979.03 |
| 11/1/2012 | 6.4 | $295 | $1,888.00 | $1,416.00 | $2,124.00 |
| 11/2/2012 | 3.9 | $295 | $1,150.50 | $862.88 | $1,294.31 |
| 11/4/2012 | 5.9 | $295 | $1,740.50 | $1,305.38 | $1,958.06 |
| 11/6/2012 | 8.2 | $295 | $2,419.00 | $1,814.25 | $2,721.38 |
| 11/7/2012 | 5.23 | $295 | $1,542.85 | $1,157.14 | $1,735.71 |
| 11/8/2012 | 5.1 | $295 | $1,505 | $1,128 | $1,692.56 |
| | | **TOTAL** | **$21,444.50** | **$16,083.38** | **$24,125.06** |

The number of hours billed is reasonable for a copyright action such as this, and is, in fact, much lower than other law firms have spent, for example, on a simple default action. *Cf. Stockart.com*, 2011 U.S. Dist. LEXIS 20470 at *48 (court found that 75 hours is a reasonable estimate of attorney hours spent on the case from filing to default judgment); *Girlsongs*, 625 F.Supp.2d at 1133 (awarding $14,322.00 in mere default). Thus, while the hourly rates charged by Plaintiffs' counsel are higher than the rates charged by some lawyers within the Denver market, the overall amount charged is in line with or lower than amounts awarded in other copyright cases. Mr. Maness respectfully submits that due to its counsel's expertise and reputation with these types of matters, efficiencies were achieved that render the total amount requested reasonable. (Decl. Kerr ¶ 12). The reasonableness of the fees are, as detailed below, further justified considering the many complex issues of first impression that needed to be researched and evaluated in a time constrained manner.  (*Id*. ¶ 13). Finally, Mr. Maness does not seek a windfall in the present action. As such, Mr. Maness has reduced his total fee request by 25%. Mr. Maness has also waived all legal research costs. (*Id*. ¶ 14)

## A.  A LODESTAR MULTIPLIER IS JUSTIFIED

The determination of the lodestar amount "does not end the inquiry because there remain other considerations that may lead the district court to adjust the fee upward or downward." *Hensley* v. *Eckerhart,* 461 U.S. 424, 434 (1983). While numerous factors may be considered by the Court, two enhancement factors often mentioned are the undesirability of the case and the contingency factor. *Ramos*, 713 F.2d at 557-58.

In terms of the contingency enhancement, the district court should first determine whether the lawyers really would have recovered fees only if they had prevailed or whether the client would have paid some fee regardless of the outcome. *Ramos, 713* F.2d at 558. Next, the

court should view the litigation as it reasonably should have appeared to the lawyers at the outset of the litigation. *Ramos*, 713 F.2d at 558.

Both factors warrant an upward adjustment in this case. First, representing someone in a strict liability claim based on the allegations of downloading hard-core pornography is not the kind of case that is likely to elicit an enthusiastic response from the defense bar. Second, when viewed at the outset of this representation, a contingency enhancement is fully warranted. First, while the representation of Mr. Maness was not *pro bono*, Mr. Maness is not in a financial position to pay all or even a majority of the attorney fees and costs for his defense. (Exhibit S - which is a true and correct copy of Mr. Maness' fee agreement). Therefore, Mr. Maness's only hope of fully or partially recouping his fees and costs was to prevail. (Decl. Maness ¶ 20.) The issues before the Court were complex and in some instances issues of first impression. Counsel is not aware of a motion to dismiss under 12(b)(6) that has been successfully argued in a similar BitTorrent case in this District. (Decl.Kerr at ¶ 15.)

Moreover, at the time Counsel accepted the representation, this case required an immediate and substantial investment of attorney time, which was compounded as defense counsel was literally communicating from the hospital where his fourth child had just been born trying to organize a defense that was due in a few short days. (*Id*. at ¶16.) Under these conditions, Defense Counsel had to investigate the underlying facts and quickly develop potential legal defenses. (*Id*.) Coupled with Malibu Media's inappropriate and abusive litigation tactics and unreasonable pursuit of this case as well as the potential for Mr. Maness to be dragged into a long and expensive defense which he could likely not financially sustain, a lodestar multiplier of 1.5 should be applied to the total fee award. Again, Mr. Maness does not seek a windfall in the present action. As such, Mr. Maness requests that all lodestar enhanced

fees be directed to the Electronic Frontier Foundation (EFF.org) which has been a pioneering organization in the field of digital and internet privacy rights and has tirelessly opposed similar abusive mass-copyright actions. Mr. Maness desires such funds to be used to support the development of computer forensics capabilities:  it is Mr. Maness' firm desire to enable the truth to be known in such cases, to minimize accusations against innocent people.

Mr. Maness incurred attorney fees in the amount of $21,444.50. An across the board reduction of 25% of this fee results in an unmodified award of $16,083.38. Finally, a 1.5 multiplier yields a final fee award of $24,125.06.

## CONCLUSION

Where wrongly targeted defendants such as Mr. Maness achieve a final adjudication on the merits, and the record demonstrates that the Plaintiff knew or had an adequate investigation been conducted, should have known that the defendant was innocent, the court should award them attorney's fees, not only to undo some of the harm Malibu Media has imposed and encourage future innocent defendants to stand up for their innocence, but also to further the purpose of the Copyright Act.

**WHEREFORE** Defendant respectfully requests an award of fees and any other relief and/or sanctions that this Court deems necessary and proper.


Respectfully submitted November 12th, 2012.


                              SANTANGELO LAW OFFICES, P.C.


                              /s/ David S. Kerr
                              David S. Kerr
                              125 South Howes St., 3rd Floor
                              Fort Collins, CO 80521
                              Telephone: 970-224-3100
                              Email: dkerr@idea-asset.com

### CERTIFICATE OF COMPLIANCE WITH D.C.COLO.LCIVR 7.1

Pursuant to D.C.Colo.L.Civ.R. 7.1(A), counsel for Mr. Maness has conferred with Plaintiff's counsel in compliance with the aforementioned rule.

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion was served by EFS and email on this 12th day of November, 2012 upon the following counsel:


Jason Kotzker
Kotzker Law Group
9609 S University Blvd., #632134
Highlands Ranch, CO 80163
jason@klgip.com


/s/ David S. Kerr
Santangelo Law Offices, P.C.
125 South Howes St., 3rd Floor
Fort Collins, CO 80521
Facsimile: 970-224-3175
Telephone: 970-224-3100
Email: dkerr@idea-asset.com